1  Wolfgang F. Hahn, Esq. (SBN. 061385)　　　SPACE BELOW PROVIDED FOR FILING STAMP ONLY]
　　Wolfgang F. Hahn + Associates
2  7160 Caminito Pepino
　　La Jolla, California 92037
3  Telephone : 858.535.1000
4  Telecopier : 858.456.5080
　　E-Mail Address: ellobo1@san.rr.com
5
　　Bankruptcy Counsel for
6  Chapter 11 Debtor BWR, LLC

7　　　　　　　　UNITED STATES BANKRUPTCY COURT

8　　　　　　SOUTHERN DISTRICT OF CALIFORNIA (SAN DIEGO)

9  In re　　　　　　　　　　　　　Case  No.  18-03650-MM 11

10

11　　　　　　　　　　　　　　　Assigned For All Purposes:
　　　　　　　　　　　　　　　　Hon. Margaret Mann

12  BWR, LLC.
13  a California limited liability company,　　Chapter 11 Proceeding

14　　　　　　　　　　　　　　　Date　:　　27 February 2019
15　　　　　　　　　　　　　　　Time　:　　2:00 P.M.
　　　　　　　　　　　　　　　　Dept.　:　　1
16　　　　　　　　　　Debtor.　　Room　:　　218

17

18

19 ━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

20　　**DEBTOR BWR, LLC's SECOND AMENDED DISCLOSURE STATEMENT**

21 ━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━

22　　　　　　　　　　　　**<u>INTRODUCTION</u>**

23　　　　Debtor-in-possession r BWR, LLC ("debtor BWR", or "BWR'"), a California limited liability

24  company, submits its Second Amended Disclosure Statement, which is being filed concurrently with

25  debtor BWR's Plan of Reorganization.

26　　　　　　　　　　　　**<u>INITIAL STATEMENT</u>**

27　　　　Pursuant to 11 U.S.C. § 1125 in connection with the above-referenced case filed under Chapter 11

28  of the Bankruptcy Code, this Disclosure Statement is intended to summarize the Plan of Reorganization of

the estate of debtor BWR as the debtor-in-possession herein, as well as to provide adequate and reasonable information about the financial affairs of the debtor-in-possession BWR to the holders of claims such that each claimant will be able to make an informed judgment about the Plan.

## I.     PRELIMINARY STATEMENT

BWR, LLC, debtor-in-possession ("debtor BWR" or "BWR") submits the following Disclosure Statement dated 13 February 2019 for consideration by its creditors:

A.     **General Information**

Pursuant to Section 1125 of the Bankruptcy Code, this Disclosure Statement is submitted to provide its creditors and all other interested parties with adequate information to allow them to make an informed judgment about acceptance or rejection of the Plan of Reorganization ("Plan"). Please refer to the Plan for treatment of claims. The provisions of the Plan are binding on all creditors and interest holders. Therefore, please read the Plan carefully.

The purpose of this Disclosure Statement is to provide such information as may be deemed material, important and necessary for the creditors of the debtor-in-possession to make a reasonably informed decision in exercising their right to vote for the acceptance or rejection of the Plan of Reorganization.

This Disclosure Statement cannot tell you everything about your rights. You should consider consulting your own lawyer to obtain more specific advice on how this Plan will affect you and what is the best course of action for you.

Be sure to read the Plan as well as the Disclosure Statement.  If there are any inconsistencies between the Plan and the Disclosure Statement, the Plan provisions will govern.

The Code requires a Disclosure Statement to contain "adequate information" concerning the Plan. The Bankruptcy Court has approved this document as an adequate Disclosure Statement, containing enough information to enable parties affected by the Plan to make an informed judgment about the Plan. Any party is now entitled to solicit votes for or against the Plan.

**NO REPRESENTATION ABOUT THE DEBTOR, PARTICULARLY ABOUT FUTURE PLANS OR THE VALUE OF PROPERTY, ARE AUTHORIZED BY THE DEBTOR OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE ACCEPTANCE OF THE PLAN OTHER THAN AS**

**CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY ANY CREDITOR OR INTEREST HOLDER. ANY ADDITIONAL REPRESENTATIONS OR INDUCEMENTS SHOULD BE REPORTED TO COUNSEL FOR THE DEBTOR WHO, IN TURN, SHALL DELIVER THE INFORMATION TO THE BANKRUPTCY COURT OR TAKE OTHER APPROPRIATE ACTION.**

**THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN SUBJECT TO A CERTIFIED AUDIT. THE RECORDS KEPT BY THE DEBTOR RELY FOR THEIR ACCURACY ON INTERNAL BOOKKEEPING. EVERY REASONABLE EFFORT HAS BEEN MADE TO PRESENT ACCURATE FIGURES. HOWEVER, THE RECORDS KEPT BY THE DEBTOR ARE NOT WARRANTED OR REPRESENTED TO BE FREE OF ANY INACCURACY.**

**THE COURT HAS NOT YET CONFIRMED THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT. IN OTHER WORDS, THE TERMS OF THE PLAN ARE NOT YET BINDING ON ANYONE. HOWEVER, IF THE COURT LATER CONFIRMS THE PLAN, THEN THE PLAN WILL BE BINDING ON THE DEBTOR AND ON ALL CREDITORS AND INTEREST HOLDERS IN THIS CASE.**

Debtor BWR recommends a vote for "Acceptance" of the Plan.

B.    **General Overview: Manner of Voting and Confirmation of the Plan**

1.    <u>**Classes Entitled to Vote**</u>    The Plan divides the claim of creditors into a number of classes. Only classes of creditors and interest holders impaired under the Plan are entitled to vote.

2.    <u>**Procedures for Voting**</u>    All creditors should cast their vote by completing, dating, and signing the Ballot included with the Plan and mailing it to: Wolfgang F. Hahn @ Wolfgang F. Hahn + Associates, 7160 Caminito Pepino, La Jolla, California 92037. IN ORDER TO HAVE YOUR VOTE COUNTED RELATIVE TO THE PLAN, YOU MUST FILE A BALLOT TO THAT EFFECT WITHIN THE TIME STATED IN THE BALLOT. In order to be counted, the ballot must be received by the date set forth in the ballot. A Ballot does not constitute a valid Proof of Claim in the bankruptcy proceedings.

C.    **Confirmation of the Plan**

1.    <u>**Solicitation of Acceptance**</u>    This Disclosure Statement will be provided to each creditor whose Claim has been scheduled by the Debtors or who has timely filed a Proof of Claim with the Bankruptcy Court. This Disclosure Statement is intended to assist creditors with their evaluation of the Plan and their decision to reject or accept the Plan. Your acceptance of the Plan may not be solicited,

unless you receive a copy of this Disclosure Statement prior to or concurrently with the solicitation of acceptance of the Plan.

**2.** <u>**Determining Acceptance of the Plan**</u>   When acceptance of the Plan is determined by the Bankruptcy Court, only the votes from the impaired classes of creditors will be counted. Therefore, votes of claimants will only be counted if submitted by those claimants whose claims or interests are duly scheduled by the debtors as undisputed, non-contingent and liquidated, or who have timely filed a Proof of Claim with the Bankruptcy Court. The classification of Claims is described in Article III below. If you are in any way uncertain if your claim has been correctly scheduled, you should review the Debtor's schedules and any amendments to schedules, which are on file at the Clerk's Office of the United States Bankruptcy Court, Southern District of California, located at Jacob Weinberger U. S. Courthouse, 325 West F Street, San Diego, California 92101**,** during their regular business hours, Monday through Friday, 9:00 A.M. through 3:30 P.M.

**3.** <u>**Hearing on Confirmation of the Plan**</u>   The Bankruptcy Court will set a hearing to determine if the Plan has been accepted by the required number of holders of claims and if the other requirements for confirmation of the Plan outlined by the Bankruptcy Code have been satisfied.  Each creditor will receive, either with this Disclosure Statement or separately, a notice of the date of the Bankruptcy Court's hearing on confirmation of the Plan. A copy of the proposed Plan is being filed contemporaneously herewith.

**4.** <u>**Acceptance Necessary to Confirm the Plan**</u>   At the scheduled hearing on confirmation of the Plan, the Bankruptcy Court must determine, among other things, if the Plan has been accepted by each impaired class. Under Section §1126 of the Bankruptcy Code, an impaired class is deemed to have accepted the Plan if at least two-thirds (66-2/3%) in dollar amount and more than one-half (50%) in number of Allowed Claims of class members actually voting have voted in favor of the Plan. Further, the Bankruptcy Court must also find that each class member will receive at least as much under the Plan as he, she or it would receive if the Debtor's property was liquidated, as of the Effective Date of the Plan under the provisions of Chapter 7 of the Bankruptcy Code.

**5.** <u>**"Cram Down" Confirmation of the Plan Without Necessary Acceptance**</u>   In the event that the requisite acceptances are not obtained from the impaired creditors, the Bankruptcy Court

may, nevertheless, confirm the Plan if the Bankruptcy Court finds that all other requirements of confirmation under Section 1129(a) of the Bankruptcy Code are met and certain additional conditions are met.

These conditions are set forth in the "cram down" provisions of Section § 1129(b) of the Bankruptcy Code and require, generally, a showing that the Plan does not discriminate unfairly, the Plan accords fair and equitable treatment, and the claimants in a non-consenting class will receive either the full value of their claims, or, if they receive less than full value, no class with a junior priority will receive anything (the "absolute priority" rule).

In order to apply the "cram down" provisions of Section 1129(b), debtor BWR is required to properly explain the "absolute priority" rule, and the alternatives facing unsecured creditors, including the consequences of denial of confirmation. *In re Genesee Cement, Inc., 31 B.R. 442, 444 (Bankr.E.D.Mich. 1983).*

Pursuant to 11 U.S.C. § 1129 (b) (2) the Court may confirm a plan even if all impaired classes do not vote for the plan in sufficient number and dollar amount so long as one impaired class has accepted the plan and treatment of the respective classes does not violate the "absolute priority" rule. *Northwest Bank Worthington v. Ahlers, 108 S.Ct. 963 (1988).* The "absolute priority" rule requires that in order for the plan to be confirmed over the objection of a class of impaired unsecured creditors, the holders of an interest that are junior in priority to the interest of such class, such as the debtor, are prohibited from receiving any money or property, unless the class of impaired unsecured creditors is to receive the full amount of the allowed claims, plus post-confirmation interest at a rate established by the Court.

6.    **Acceptance Necessary to Confirm the Plan.**

The Bankruptcy Code provides certain minimum requirements for confirmation, but the Court may decide that a Plan is not fair and equitable and is therefore unconfirmable even if it is in technical compliance with these requirements. *In re Sandy Ridge Dev. Corp., 881 F.2d 1346 , 1352 (5th Cir. 1989), reh'g. denied; In re D & F Construction, Inc. 865 F.2d 673 (5th Cir. 1989); Matter of IPC Atlanta Ltd. Partnership, 142 B.R. 547, 555 (Bankr.N.D.Ga. 1992).*

The "fair and equitable" requirement is satisfied with respect to a secured claim so long as the claimholder: 1) retains the lien; and 2) receives "deferred cash payments totaling at least the allowed

amount of such claim, of a value, as of the effective date of the plan,

of at least the value of such holder's interest in the estate's interest in such property." *In re Bryson*

*Properties, XVIII, 961 F.2d 496, 500 (4th Cir. 1992).*

In this case, if cram down is necessary, all secured creditors will be retaining their liens on the

property in the priority as existed at the time of the confirmation of the Plan.

These are complex statutory provisions and this summary is not intended to be a complete

statement of the law.  It is the hope of the Debtor that the plan will be consensual and resort to the "cram

down" provisions will not be necessary.  Until creditors vote on the Plan, it is impossible to determine to

what extent the "fair and equitable" test will need to be invoked.

To the extent that any class does not accept the Plan or is deemed not to have accepted the Plan, the

Debtor will request the Bankruptcy Court to confirm the Plan pursuant to Section 1129 (b).  Debtor BWR

believes that the Plan will meet the "fair and equitable" test and comply with the "absolute priority" rule.

Under the Plan, although all property of the bankruptcy estate revests in the Debtor upon

confirmation, such property will be operated for the benefit of the creditors.

## II.    STATEMENT OF OPERATIVE FACTS

A.    **Prior Bankruptcy History:**
      **Debtor/Owner/Operator Imperial Palms Resort, LLC + Its Barbara Worth Resort**

Mired in almost $8,000,000 of secured debt alone and saddled with hopelessly inexperienced, and

incompetent  managers in Daniel and Rebecca Chiu (the "Chius"), on 31 July 2017, Imperial Palms Resort,

LLC ("debtor Imperial", or "Imperial") filed it voluntary petition for protection under Chapter 11 of the

Code. (Case No. 17-04553-MM 11). At the time of its bankruptcy filing, debtor Imperial's secured debt

structure was, as follows:

| | Lender | Loan Amount [1] | Cumulative | TD Position |
|---|---|---|---|---|
| 1 | CCDFI | $ 2,780,000.00 | | First |
| 2 | Creditor Kevin Smith | 299,355.00 | 3,079,355.00 | Second |

---

[1]    Rounded. Loan amounts as reflected in filed Claims; if no claim filed, amount appearing in debtor's bankruptcy schedule.

| | | ("Smith Note") | | |
|---|---|---|---|---|
| 3 | Creditor Darryl Readshaw | 215,000.00 | 3,294,355.00 | Third |
| 4 | Creditor Qing Tao | 500,000.00 | 3,794,355.00 | Fourth |
| 5 | Insider OASIS | 4,160,000.00 | 7,454,355.00 | Fifth |

In addition, Imperial was burdened with over $2,000,000 of unsecured debt, including large sums owed to

the Internal Revenue Service, the Franchise Tax Board and the EDD.

At the time, debtor Imperial owned the 99-acre Barbara Worth Country Club, Hotel and

Resort property ("Barbara Worth Resort", or "Resort"), located at 2050 Country Club Drive, Holtville,

California 92250, consisting of 104-room Imperial Palms Hotel with four (4) apartment-type units,

configured in two (2) buildings, a conference and convention center, ballroom, restaurant/bar and an 18-

hole golf course with a driving range, practice greens and pro shop (retail). All income generated by debtor

Imperial's business operations at the Resort emanates from its four (4) seasonal profit centers, consisting of

(a) the 104-room hotel  revenue plus four (4) apartments; (b) the 18-hole golf course revenue; (c) the food

and beverage revenue generated by the onsite restaurant and bar; and (d) special events, utilizing hotel

room service, the banquet, convention and conference center.[2]

The Resort's 10,000 square foot "divisible" convention center, banquet and ballroom facility is not

only the largest in the Imperial Valley, but also the only one of its size with parking for 800 automobiles,

while the golf course is one of the nicest in the area, making the Barbara Worth Resort the "big fish" in the

small pond. (By way of comparison, the downtown El Centro Marriott has over a 100 rooms, but no

convention center).

Given weather conditions in the Imperial Valley, Barbara Worth Resort operations are  seasonal.

According to U.S. Climate Data, temperatures in the Holtville–El Centro area, average 94° in May, 103° in

June, 107° in July, 106° in August in and 101° in September. Given its seasonal nature, historically,

monthly operational "shortfall" deficits, can and must be anticipated, expected and fiscally planned for

during the months of June  through September ("non-seasonal"), while the months of October through May

---

[2]    A true and correct copy of the Legal Description of the Resort is marked as Exhibit A, is attached hereto and by this reference is incorporated herein.

DEBTOR BWR. LLC'S SECOND AMENDED DISCLOSURE STATEMENT

IN RE BWR, LLC                                                                                    PAGE    7

("seasonal months"), can be expected to generate income in excess of its operating expenses with sufficient cushion to cover the shortfall encountered in the non-seasonal months.

The Chius, through Oasis Growth Partners, LLC, a California limited liability company, and IWTR, Inc. (fka Karlen Capital Corporation), a California corporation, both of which were wholly-owned and controlled by them, acquired approximately 73.0% of the controlling membership interest of Imperial in June 2015 from the Resort's previous owners. At the time of its acquisition by the Chius, according to Darryl Readshaw's sworn statement, who lived "on property" from roughly August 2011 through June 2015, submitted in debtor Imperial's original Chapter 11 bankruptcy case:

    (i)    During the time he managed the Resort property, "revenue from the Resort's golf course operations averaged approximately $45,000 to $55,000 per month for the seasonal months of October through May, while the non-seasonal months of June through September average approximately $10-$15,000 per month"; *[p. 3, ¶ 10, Doc. 74-3, Imperial Bk. 1]*

    (ii)    With the exception of one (1) instance, during the forty-month period while (he) and Mr. Smith "were 'onsite' and managing the Resort, (they) were able to generate sufficient income from operations to service secured creditor CCDFI's loan. During that period, for one operational year, (they) were able to generate over $3,300,000 of revenue at the Resort.";*[p. 4, ¶ 11, Doc. 74-3, Imperial Bk. 1]*

    (iii)    In fact, according to Mr. Sader, the Resort's operations for a twelve (12) month period generated approximately $4,000,000 in gross revenues

Concurrently with their acquisition, in June 2015, Imperial retained Mr. Ghassan J. Sader and his company Sader Hospitality Worldwide, LLC ("Sader Hospitality" (Website:www.saderhospitality.com), as its hotel/resort manager. Sader Hospitality is a privately owned hospitality management group and consulting company offering over four (4) decades of industry experience, specializing in financial review, receivership, and turnaround for hotels, resorts and restaurants. However, Imperial and the Chius refused to provide Sader Hospitality with any type of accounting controls or financial oversight, secretively retaining all "day-to-day" financial oversight and controls.

For a period of time, the Resort continued to do well; however, given the Chius' collective and complete lack of managerial experience in any phase of the Resort's operations, their stubborn refusal to listen to the advice of their managerial team and Rebecca Chiu's tragic fiscal decisions, over the next twenty-one (21) months, the Resort's operations and its income stream started to decline. Concurrently, to

1  make matters worse, the Chius started, on a regular and ongoing basis continuing up to Imperial's filing of

2  its Chapter 11 case in July 2017, diverting a substantial amount of the Resort's revenues (estimated in

3  excess of $800,000) to themselves personally and entities controlled by them, thereby stripping the Resort

4  of its ability to pay its debts in a timely fashion. As a direct result, in December 2016, Imperial, for the first

5  time, was unable to meet its monthly mortgage payment to CCDFI – a pattern that continued throughout

6  Imperial's Chapter 11 bankruptcy case.

7         After ever increasing discord and acrimony between Mr. Sader and his managerial team and the

8  Chius, based in large part, on the Chius' refusal to adhere to the Sader team's managerial advice and Mr.

9  Sader's realization of the Chius' personal and ongoing diversion of the Resort's operating revenues – the

10 Chius "fired" Mr. Sader and the Sader Hospitality team in February 2017.

11        Subsequently, on 7 April 2017, CCDFI filed its notice of default and election to sell, followed by

12 notice of trustee sale by CCDFI on 11 July 2017. Mired in debt and unable to pay their suppliers as well as

13 their lenders, they were forced to throw Imperial into Chapter 11 on 31 July 2017 (Case No. 04553-MM 11

14 ("Imperial Bk. 1").

15        After a fruitless nine-month sojourn in the bankruptcy court, on 4 May 2018 after hearing, Judge

16 Mann converted the debtor Imperial's case to Chapter 7 [**Doc. No. 203**], citing debtor's "gross

17 mismanagement of the estate", leading to the estate's observable diminution, together with a myriad of

18 Section 1112(b)(4) factors insightfully outlined by U. S. Trustee Leslie A. Skorheim in her 11-page

19 memorandum [**Doc. No. 199**] The conversion was quickly followed a few short days later on 9 May 2018

20 with the Court's dismissal of Imperial's Chapter 7 case [Doc. No. 210].

21        Undeterred, on 25 May 2018, debtor Imperial, facing a trustee's foreclosure sale initiated by the

22 junior lienholder scheduled for 2:00 P.M. that afternoon, Imperial again filed a Chapter 11 petition shortly

23 before the scheduled trustee's sale, thereby illegally frustrating and blocking the scheduled foreclosure sale

24 scheduled for that same afternoon (Case No. 18-03170-MM 11). ("Imperial Bk. 2")

25        Shortly thereafter, on 5 June 2018, only hours after the Court had dismissed debtor Imperial's most

26 recent Chapter 11 bankruptcy case and again facing a scheduled foreclosure sale that same afternoon,

27 debtor Imperial again filed its third meritless Chapter 11 bankruptcy case, which again blocked the

28 scheduled foreclosure sale scheduled for that same afternoon and which was again dismissed by the Court

   on 20 June 2018 (Case No. 18-03442-MM 11). ("Imperial Bk. 3")

1    Both the Imperial Bk. 2 and Imperial Bk. 3 were orchestrated by Mr. Eddie Mejorado, a local El

2    Centro businessman, through his San Diego attorney Francisco Javier Aldana. Allegedly, in May 2018

3    after the Court's dismissal of Imperial Bk. 1, Mr. Mejorado acquired Oasis Growth Partners, LLC's 73.0%

4    the controlling membership interest of debtor Imperial.

5    **B.    Debtor BWR And Its Initiation of Chapter 11 Proceeding**    Debtor BWR, a

6    California limited liability company, organized and existing under the laws of the State of California, is and

7    legally qualified to do business in the State of California. BWR was formed on 22 May 2018 by Kevin

8    Smith, the holder of the Smith Note, who, in turn, for valuable consideration, through a Note Purchase

9    Agreement, sold his Smith Note to NAC 1, LLC ("NAC 1"), also a California limited liability company.

10    Shortly thereafter NAC 1 exchanged its Smith Note with BWR in return for 100.0% of BWR's

11    membership interest,

12    Relying on the Ninth Circuit *Bibo* case,[3] debtor BWR, in a perfectly legitimate effort to preserve

13    and safeguard its beneficial and equitable junior lienholder interest in a Note and Deed of Trust securing

14    the Barbara Worth Resort property, initiated this proceeding on 19 June 2018 under the auspices of Chapter

15    11 of the United States Bankruptcy Code, 11 U.S.C. Sec. 101, et seq. filed its voluntary petition under Title

16    11 of the United States Bankruptcy Code (as amended). The filing itself was triggered by the first trust

17    deed holder Clearinghouse Community Development Financial Institution's ("CCDFI") impending

18    foreclosure sale of its $2,671,559.00 first deed of trust encumbering the real property scheduled for the

19    following day - 21 June 2018. In so doing, through BWR's bankruptcy filing, BWR's pending Chapter 11

20    bankruptcy case, is the fourth bankruptcy case involving the Barbara Worth Resort in the span of roughly

21    eleven (11) months.

22    All of BWR's membership interest remains in and is wholly owned by NAC 1, LLC. Originally, all

23    of NAC 1, LLC's membership interest was owned by Kevin Smith; however, on 20 June 2018, Mr. Smith

24    entered into an Option Agreement with Mr. Eddie Mejorado, providing him with a 21-day option period

25    within which he could acquire all of Mr. Smith's membership interest in NAC 1. On 11 July 2018, Mr.

26

27    _____

3    *In re Capital Mortg. & Loan. Inc. (Bankr.E.D.Cal.1983 In) 35 B.R. 967, cit. In re Bibo (9th Cir. BAP
28    1996) 200 B.R. 348* (senior lienholder's action in foreclosing against real property in which debtor held a junior lien, violated § 362(a) as completion of foreclosure process would extinguish debtor's lienholder rights).

Mejorado exercised his option under the terms of the Option Agreement and acquired 100.0% of NAC 1's membership interest.

**C.  BWR's Acquisition Of The Shuttered Barbara Worth Resort, Debtor's Post-Petition Indebtedness And Its Post-Petition "Turn-Around" Activities**

On 20 June 2018, BWR, as the high bidder through its credit bid, completed its trustee's foreclosure sale under its Note and Deed of Trust in a second position, obtaining ownership of the Barbara Worth Resort, evidenced on 22 June 2018 by the Trustee's Sale Deed recorded. In so doing, over $5,100,000 of secured indebtedness and approximately $2,000,000 of unsecured debt was extinguished, paving the way for realistic reorganization and rehabilitation of the Resort.

As of 20 June 2018, the BWR estate was approximately indebted, as follows:

**(a)  Secured  Indebtedness**

| | | |
|---|---|---|
| Real Estate Taxes | $ | 9,291.00 |
| First Trust Deed Principal + Accrued Interest [Through 20 June 2018] | | 3,075,717.00 |
| **(b)  Unsecured Indebtedness** | | 96,731.00 |
| | | ----------------------- |
| **Total Indebtedness @ Initiation of Proceeding** | **$** | **3,271,739.00** |

However, upon its acquisition of the Resort, debtor BWR discovered that the Resort was shuttered, in terrible disarray with a massive amount of deferred maintenance, wholly uninsured and generating absolutely zero income from its shuttered 104-room hotel plus four (4) apartments, restaurant/bar and golf course and was deriving absolutely no income whatsoever from any of its previously regular four (4) income generating operations: hotel, banquet/convention, bar /restaurant or golf course operations. The administrative offices had been left in shambles, devoid of any type of business organizational files, rendering evaluation of the true condition of the various income-generating sources i.e. hotel rooms, restaurant/bar and golf course virtually impossible. Additionally, the Resort's employees' payroll was substantially in arrears and the employees were mostly uncooperative due to their justified feelings of

1   betrayal and malfeasance by debtor Imperial's managers Daniel and Rebecca Chiu.

2

3        Since 11 July 2018 when Mr. Mejorado took over the debtor's operations relative to the Resort, debtor, through Mr. Mejorado's extensive equity capital infusions presently exceeding $500,000,

4   substantial improvements have been made to the Resort and its overall condition.

5        Previously, since 15 October 2018 through to the present, the following state of affairs are in place

6   at the Barbara Worth Resort, some of which have changed and/or been modified, as follows:

7

8     [1]   Resort's Income-Generating Operations    Once again, all of the Resort's income generation and profit center operations, namely consisting of (a) the 104-room hotel and

9          apartments revenue; (b) the 18-hole golf course, driving range and pro shop revenue; and (c) the food and beverage revenue generated by the onsite restaurant and bar, as well as

10          (d) room service, the banquet, convention and conference center have re-opened and are being operated by the debtor;

11

12        (a)    From an operations standpoint, the debtor's overall Resort operations have generated a consistent operational loss, which has been covered by Mr.

13              Mejorado's capital contributions from July 2011 through to the present.

14     [2]   Revenue Generation and Filing of Monthly Reports ("MORS")

15        (a)    Debtor BWR failed to file any monthly operating reports until it retained a qualified accountant in Ms. Carmen Zamora. Since her retention by the debtor in

16              mid-to-late November 2018, BWR's newly-hired accountant Carmen Zamora has caused the filing of the debtor's tardy monthly reports for the months of June 2018

17              through September 2018. Since then all of debtors' MORS have been filed in a timely manner.

18

19        (b)    Ms. Zamora's task was further complicated by her discovery in late November

20              2018  that, starting after his acquisition of BWR's controlling interest in early July 2018, Mr. Mejorado utilized a non-DIP Bank of America account under the name

21              of Barbara Worth Country Club, LLC ("BWCC"), a New Jersey limited liability

22              company, which he had opened with an initial $25,000.00 deposit on 30 May 2018, instead of using the debtor's DIP accounts set up at Wells Fargo Bank by Mr.

23              Kevin Smith. At the time of the opening of the BWCC account, Mr. Mejorado held no interest in the NAC 1 or the debtor BWR. While the account is now closed,

24              during its term, Mr. Mejorado deposited both personal funds of his own as funds derived from the Resort's operations after 11 July 2018.

25

26           (1)    After selling his NAC 1 interest to Mr. Mejorado, Mr. Smith refused to provide Mr. Mejorado with the debtor's checkbook and checks, insisting that

27               Mr. Mejorado obtain a new EIN for the debtor because of his erroneous belief that he would have continuing liability due to the fact that he had filled out

28               the Application for the EIN. Mr. Smith went so far as to contact the IRS on 8

---

**DEBTOR BWR. LLC'S SECOND AMENDED DISCLOSURE STATEMENT**

IN RE BWR, LLC                                      **PAGE**  12

August 2018, via facsimile and/or email and request that the IRS "close (his) EIN number due to sale of the business."

(2)    On 14 August 2018, BWR's counsel sent correspondence to the IRS clarifying the matter and pointing that Mr. Smith's statement was false and demanding that the IRS ignore Mr. Smith's request.

(c)    Due to poor accounting and record-keeping, previous bookkeepers were essentially running debtor's books manually on a "cash basis" without a computerized accounting system. The debtor's records were very poor and record-keeping procedures inadequate, incomplete or missing books and records, lack of organization and of efficient accounting practices. In order to enable debtor's filing of its tardy monthly reports and get a handle on the debtor's income, debtor's accountant balanced all of the general ledger accounts and reconciled the cash receipts to the unredacted bank statements of the Bank of America's non-DIP account utilized by the debtor.

(d)    BWR's accountant Carmen Zamora is in the process of (i) revising all of the debtor's MORs to include business disbursements made on behalf of the debtor, whether these disbursements were made from the non-DIP Bank of America a/count or directly to the vendor/creditor from Mr. Mejorado or another third party[; (ii) providing an accounting of all cash withdrawals from the Bank of America account, as well as an explanation of all other payments/disbursements from the non-DIP Bank of America account identifying and verifying all business expenses made on behalf of the Debtor.

(e)    If upon completion of Ms. Zamora's accounting review, it is determined that Mr. Mejorado in any way used funds derived from the Resort's operations, Mr. Mejorado will be responsible and will reimburse the debtor. However, given the massive capital infusions in excess of $500,000.00 and the rather small personal expenditures reflected in the BWCC bank statements, it is not currently anticipated that any such figure would be substantial.[4]

(g)    Based thereon, since roughly July 2018 through January 2019, debtor has generated income in excess of $350,000.00 after subtracting Mr. Mejorado's roughly $30,000 of capital contributions infused into the debtor through deposits into Mr. Mejorado's Bank of America's non-DIP account utilized by the debtor.[5]

(h)    It is currently anticipated that the debtor's January 2018 monthly report will reflect operational revenues of approximately $_____;[6] however, debtor BWR received a capital infusion of $110,000 from Mr. Mejorado on 6 February 2019,

---

[4]    Mr. Mejorado has provided all BWCC bank statements to secured creditors CCDFI and TCF, the UST's offices and the Court. Upon request, all BWCC bank statements will be provided to any unsecured creditor.
[5]    This Disclosure Statement will be amended to provide the exact figure when such numbers are available upon completion of Ms. Zamora's accounting review.
[6]    See, fn. 5 above.

which was deposited into the debtor's non-cash collateral DIP account at Wells Fargo Bank.[7]

    (i)   Based on the "break-out" of the various categories of income generated by the Resort now provided by BWR's accountant, BWR's counsel filed debtor's Nunc Pro Tunc Use of Cash Collateral Motion on Friday, 11 January 2019, which is presently scheduled to be heard on 14 February 2019.

[3]   "Adequate Protection" Provided by Debtor BWR

    (a)   <u>Payments to Secured Creditors CCDFI</u>  Since Mr. Mejorado's involvement, the debtor has made five (5) "adequate protection" payments to CCDFI, totaling $87,964.40 ($17,592.88 x 5 for October 2018 through February 2019);

    (b)   <u>Payments to Secured Creditor TCF Equipment Finance</u>  Since Mr. Mejorado's involvement, debtor has made lease payments to secured creditor TCF Equipment Finance, totaling $28,574.00 ($5,198.00 x 5 for September 2018 through January 2019 + $2,584.00, satisfying a $15,386.00 delinquency under TCF's Lease;[8]

    (c)   Payment of Post-Petition $14,462.14 to Imperial County Treasurer - Tax Collector (Property Taxes (December 2018 – First Installment) paid on 6 February 2019, as required under Section 1112(b)(4)(I) of the Code;[9] and

    (d)   Capital Infusions (Multiple) by Mr. Mejorado exceeding $500,000, most recently

[4]   Retention of Professional Managerial Assistance  As previously admitted to this Court, professional "hands-on" hotel resort managerial services are desperately needed to rebuild and "restart" the Resort's operational capacities toward the path of financial sustainability.

    (a)   As part of the Sader Hospitality retention, given Mr. Sader's 21-month tenure at the Resort, the Company will be able to provide realistic financial projections as to the Resort's income-generating operations going forward.

    (b)   On 28 January 2019, debtor's counsel filed its Application to Employ Mr. Sader and his company Sader Hospitality Worldwide [Doc. 159], which subject to the Court's Modified Order Shortening Time [Doc. 152, 159], is presently scheduled to

---

[7]   True and correct copies of Mr. Mejorado's $110,000.00 check drawn on Sun Community Federal Credit Union [Chk. No. 4026965] and the Wells Fargo Bank DIP Account Deposit Slip are marked as Exhibit E and are attached to the Declaration of Eddie Mejorado filed concurrently herewith, which by this reference are hereby incorporated.

[8]   Previously, secured creditor CCDFI had not received a mortgage payment since November 2016 and TCF had not received a lease payment in 5-6 months, its golf carts were "uninsured" and the Company was totally unaware of where its golf carts were located.

[9]   True and correct copies of the accompanying receipts verifying debtor's payment of post-petition December 2018 installment paid to the Imperial County Treasurer - Tax Collector (Property Taxes) in the amount of $14,462.14 are marked as Exhibit B and are attached to the Declaration of Eddie Mejorado filed concurrently herewith, which by this reference are hereby incorporated.

**IN RE BWR, LLC**           **DEBTOR BWR. LLC'S SECOND AMENDED DISCLOSURE STATEMENT**
                                        **PAGE**  14

be heard on 14 February 2019, together with the debtor's *Nunc Pro Tunc* Use of Cash Collateral Motion.

[5]  <u>Equity Capital Infusions and Refinancing Efforts</u>    To date, debtor's principal Eddie Mejorado has infused over $500,000 in the renovation, rehabilitation and relaunching of the Resort and has represented his desire in continuing to do so. In addition, Mr. Mejorado has been actively engaged in seeking lending sources to refinance the Resort in order to "pay-off" the obligation owed to CCDFI.

[6]  <u>Insurance</u>    When Mr. Mejorado acquired the controlling interest of the debtor on 11 July 2018, the Barbara Worth Resort was "uninsured", as the prior debtor Imperial Palms Resort ("Imperial") had permitted it to lapse for "non-payment". Personally, on behalf of the debtor, Mr. Mejorado, reinstated the debtor's insurance coverage retroactively,  to 1 July 2018, consisting of full and complete coverage under the following policies: (i) Hotel/Motel; (ii) Golf Course; and (iii) Umbrella for a total annual premium of $83,330, paid in monthly installments, which remains current through February 2019, debtor having paid in excess of $60,000.00 in premiums  to date.

[7]  <u>Employees</u>    As of 15 August 2018, debtor entered into a  Labor Contract with C & S Harvest, LLC, whereby many employees employed at Barbara Worth became C & S employees with C & S covering all wages and employees taxes and withholding.

<u>Resort Employment</u>    When fully operational, the Resort employs approximately 35-45 employees in various capacities.

[8]  <u>Utilities (Water, Electric, Etc.</u>    As of  20 June 2018, the Resort was approximately $25,000.00 in arrears to the utility companies, dating back to the Imperial days, all of which has been resolved and is being kept current through Mr. Mejorado capital infusions. To date, debtor is current and paying its utilities virtually on a "current" basis.

[9]  <u>U.S. Trustee's Fees</u>    As of 7 January 2019, the debtor is current, having paid  all U.S. Trustee's quarterly fees for 2018, totaling $3,250.00. ($325.00 – 2nd. Qtr.; $975.00 - 3rd Qtr. + $1,950.00 - 4th Qtr.)

[10]  <u>Hotel Room Renovation</u>    As of 7 January 2019, of the Resort's 104 hotel rooms, most, if not all, of  Building A's 56 units have been renovated, while again, most if not all, of Building B's 48 rooms been renovated – all of which are ready for rental

[11]  <u>Re-Opening of Restaurant + Bar</u>    Upon "takeover", the Resort's restaurant and bar were closed, having failed to meet the Imperial Health Department's standards. All the work required and set out by the Imperial County Health Inspector totaling in excess of $30,000.00 has been completed and clearance to reopen from the Imperial County Health Inspector and restaurant/bar have re-opened. The restaurant/bar facility has been completely renovated and is fully operational, awaiting the issuance of a liquor license..

[12]  <u>Liquor License</u>    On 21 December 2018, after clearance from the Imperial County Health Inspector to re-open, debtor BWR, upon payment of $15,384.00 advanced by Mr. Mejorado, obtained an Original On-Sale General Eating Place Liquor License from

the Alcohol Beverage Control Board ("ABC"). The Resort has been permitted to conduct "special events" at which alcohol can be served. While the premises have been posted, a "punch list" of items remain before the ABC will issue a liquor license; it currently appears that the remaining issues will not be resolved until September-October 2019. Until then, restaurant/bar can only serve alcohol for special events for private parties.

[13]  <u>Pool/Bathing Facility</u>    Upon "takeover" the swimming pool was closed and non-operational; again after over $30,000 its repairs advanced by Mr. Mejorado, all the work has been done and is currently awaiting inspection by the City. Upon inspection approval, the pool will be plastered at a cost of about $25,000.00, labor and materials

[14]  <u>Golf Course Operations</u>    (a)    When Mr. Mejorado took over, the Resort golf course was in shambles and in horrible condition; he spent considerable monies in labor and materials to bring it back; he has spent $37,395.72 on seed for the annual re-seeding that all golf course undergo in September-October of each year and irrigation repairs; and (b) To date, BWR has collected of $_____.00[10] in greens fees and now boasts 100 members in its newly-formed golf club with monthly dues at $100.00 per month.

[15]  <u>Credit Card Facility</u>    Originally, BWR reached agreement with the Paysafe Group, but ultimately switched to Square One and continues to have the ability to accept and process credit card payments from customers.

**D.    Procedural Events Subsequent to Initiation of Chapter 11 Proceeding**

Soon after the filing of the Petition, debtor BWR negotiated with secured creditor TCF Equipment Finance and entered into a Stipulation for Assumption of TCF Lease Agreement, which was subsequently approved pursuant to the Court's Order dated 8 August 2018 [Doc. No. 54], while maintaining TCF's security position in the collateral acting as security for its Lease.

In light of the shuttered nature of the Resort's operations and total lack of income stream at the time of the BWR's post-foreclosure takeover on 20 June 2018, debtor has <u>not</u> filed a Motion for Authority to Use Cash Collateral ("Cash Collateral Motion"), as permitted under the Code. While CCDFI has no security interest in revenues generated from restaurant/bar, banquet, convention and golf club operations, it does have a security interest in the hotel room revenues and shortly, as debtor has started collected revenue from hotel room rentals, debtor will be filing its Cash Collateral Motion to assist it in meeting the normal operating expenditures of the hotel property. *In re Premier Golf Properties, LP (9th Cir. BAP 2012) 477 B.R. 767*

---

10      See, fn. 5 above.

**E.**    **Transactions with Insiders.**    Mr. Eddie Mejorado owns 100.0% of the membership interest in NAC 1, LLC, which, in turn, owns all of the membership interest in debtor BWR. Mr. Eddie Mejorado owns 100.0% of the membership interest in Resort Mgmt., LLC, which manages the debtor's properties presently without fee or compensation.

**III.**    **SUMMARY OF PLANS AND TREATMENT AND PAYMENT OF CREDITORS**

The Plan provides for the creation of four (4) classes of creditors and one class (1) of equity security holders. The classes are:

**CLASS I  –  SECURED CLAIMANTS**

**CLASS I-A**:    This class consists of the Imperial County Tax Assessor obligation presently in the approximate amount of $99,291.00. As permitted by the Code, this class will be paid in full on a priority basis at the completion of the Plan performance, which is twenty-four (24) months from and after the Effective Date of the Plan. In the interim, the statutory lien for real property taxes remains in place and the debtor will make the normal and usual semi-annual real estate tax payments post-petition and post-Plan, utilizing either secured creditor's cash collateral to the extent available from the property's rental cash flow or from equity capital contributions by equity stakeholders. In the interim, all regular real estate tax payments will be made on a current basis.[11] The Imperial County Tax Assessor claim is impaired under the Plan.

**CLASS I-B**:    This class consists of the First Trust Deed indebtedness, held by secured creditor Clearinghouse Community Development Financial Institution ("CCDFI") on the debtor's Resort property. CCDFI asserts a claim of $3,076,217.04, as of Petition Date and a claim of $3,279,948.76, as of 21 September 2018, which amounts BWR disputes. Debtor intends to files its Objection to CCDFI's claim and will agree to pay the court-approved claim of secured creditor CCDFI in full, subject to CCDFI's submission of its supportive ledgers and calculations relative to the amount it alleges is owed by the debtor pursuant to the Business Loan Agreement, Promissory Note, Deed of Trust and Assignment of Rents, Commercial Security Agreement and UCC-1 Financing Statement dated 1 August 2012. Upon confirmation of the Plan, as adequate protection, debtor will continue making monthly adequate protection payments to secured creditor CCDFI in the amount of Seventeen Thousand Five Hundred and Ninety-Two

---

[11]    As previously pointed out, on 6 February 2019, debtor made its December 2018 (First Installment) post-petition payment of $14,462.14 to Imperial County Treasurer - Tax Collector for current property taxes.

1  and 88/100 Dollars ($17,592.88) from and after the date of confirmation of the Plan and will pay CCDFI

2  in full on a priority basis either by way of refinancing of the debtor's Resort property, or by way of a

3  combination of refinancing proceeds coupled with an equity contribution covering any shortfall from the

4  refinance proceeds during or sale during or upon the completion of the Plan performance period, which is

5  twenty-four (24) months from and after the Effective Date of the Plan. This class is impaired.

6  **CLASS I-C**:         This class consists of secured creditor TCF Equipment Finance and is

7  secured by fifty (50) golf carts presently in use at the debtor's Resort property. Debtor and secured creditor

8  TCF entered into Stipulation for Assumption of TCF Lease Agreement as negotiated between the parties

9  and approved pursuant to the Court's Order dated 8 August 2018 [Doc. No. 54], while maintaining TCF's

10  security position in the collateral acting as security for its Lease. Debtor has made the monthly lease

11  payments of $5,198.00 commencing in September 2018 through January 2019 consisting of the regular

12  $2,198.00 monthly lease payment and $3,000.00 in reducing the total outstanding delinquent payments of

13  $15,386.00 previously defaulted upon by the original lessee Imperial Palms Resort, LLC. In February 2019,

14  with BWR's payment of $2,584.00, the entire $15,386.00 delinquency was retired. Regular monthly lease

15  payments in the amount of $2,198.00 will be made during the Plan performance period and until the lease

16  terms expires in November 2019, at which time debtor will have the option to either purchase the golf carts

17  at their then-appraised fair market value, renew and extend the lease, or return the golf carts. TCF contends

18  that it is owed attorneys' fees and costs incurred in the prior debtor Imperial bankruptcy case (Imperial Bk.

19  1), which debtor disputes. This claim is impaired.

20                              **CLASS II   -   UNSECURED CREDITORS**

21          In that there are no Priority Unsecured Claims specifically referred to in Code §§ 507(a)(3), (4), (5),

22  (6) and (7), Class II consists of the general unsecured claims not entitled to priority under Code section

23  507(a). There are three (3) classes of general unsecured claims.

24  **CLASS II-A**:         This class consists of all allowed claims of the non-insider

25  unsecured creditors in the combined amount of $96,731.00. This class will be paid in full together with

26  interest at the rate of ten percent (10%) per annum calculated from and after the date of filing of the petition

27  filed herein on or before twenty-four (24) months from and after the date of confirmation of the Plan

28  described herein. This class is impaired under the Plan.

---

**DEBTOR BWR. LLC'S SECOND AMENDED DISCLOSURE STATEMENT**

IN RE BWR, LLC                                                    **PAGE**   18

**CLASS II-B**:        This class consists of all insider unsecured claims primarily consisting of the equity capital contributions in an amount that presently exceeds $500,000.00 of Eddie Mejorado, the sole member of NAC 1, LLC, which, in turn holds all of debtor BWR's membership interest. Mr. Mejorado intends to continue to make the necessary and supplemental equity capital contributions on the debtor's behalf until such time as the income stream from the debtor's Resort property increases to the point that such equity contributions no longer become necessary. This class will take nothing under the Plan.

### ADMINISTRATIVE CLAIMS

This class consists of all administrative claims entitled to be approved for payment pursuant to the provisions of 11 U.S.C. § 503 and specifically includes the quarterly fees of the United States Trustee for the life of the Plan.  All quarterly fees have been and will continue to be paid timely.  All other administrative expense, except for BWR's legal counsel, will be paid in accord with their terms and as incurred.

Legal counsel for the Debtor is also a member of this class. Legal counsel was engaged pursuant to an engagement agreement, subject to court approval, which anticipates that counsel would be compensated by the payments of fees accrued at counsel's ordinary and usual rates and costs incurred, all subject to court approval under Section 330 of the United States Bankruptcy Code (11 U.S.C. § 330. Given the retainer currently in the hands of counsel was contributed by a third party and does not constitute property of the debtor, it is estimated that legal counsel will be paid from debtor funds in hand as opposed to debtor income generated during the Chapter 11 period of administration. To the extent there is a shortfall, the same will be paid from Debtor income during the Plan performance period, subject to the proviso that Plan payments are first made and court approval is obtained.

### IV.    EXECUTORY CONTRACTS

Other than the TCF Equipment Lease which has been assumed by debtor, to the extent that executory contracts are in existence, have not been previously assumed and have not been rejected by specific order of this court prior to confirmation of the Plan, the same shall be assumed as a consequence of confirmation of the Plan.[12]

---

[12]    Other than the assumption of the lease for fifty (50) golf carts with TCF Equipment Finance, debtor BWR is unaware of any other executory contracts that is being assumed by the debtor.

**DEBTOR BWR. LLC'S SECOND AMENDED DISCLOSURE STATEMENT**

IN RE BWR, LLC                                                                    **PAGE**    19

**V.    MEANS OF IMPLEMENTATION OF THE PLAN**

    **A.    Barbara Worth Resort Venue State and Value**

Fueled by over $500,000 of cash infusion on debtor's behalf by Mr. Mejorado, all of the debtor's income-generating operations, namely the hotel, restaurant/bar, convention center and banquet facility as well as the golf operations are once again open and operating. Given its prior shuttered status, it is anticipated that over the next nine (9) to twelve (12) months, the income streak derived from these operations will steadily increase. Prior to the hearing date, debtor will provide a detailed operating proforma  and projection based on present operational factor s as well as projections through the twenty-four (24) month life of the Plan

    **B.    Summary of Barbara Worth Resort Valuation Components**

In conjunction with detailed operating proforma and projections referenced above, prior to the hearing date, debtor will provide a valuation – component by component – based upon its income producing proformas referenced above.

    **C.    Classification and Payment of Creditor**

    <u>Class I-A</u>    Real estate taxes. From and after the date of the filing the petition and semi-annually throughout the twenty-four (24) month plan performance period, the debtor will make the normal and usual real estate tax payments. On or before twenty-four (24) months from and after the confirmation of the Plan, the $99,291.00, together with any accrued interest and penalties thereon will be paid in full either by way of the sale of the Resort, refinancing of the Resort property or a combination of refinancing proceeds with supplemental equity contribution in the event that the refinance proceeds are insufficient to retire all secured and unsecured claims under the Plan.

    <u>Class I-B</u>    From and after the confirmation of the plan, the debtor will make monthly adequate protection payments of interest in an amount to be determined by the Court to the secured creditor CCDFI for a period of twenty-four (24) months at which time CCDFI shall be paid in full either by way of sale of the Resort, the refinancing of the Resort property or a combination of refinancing proceeds with supplemental equity contribution in the event that the refinance proceeds are insufficient to retire all secured and unsecured claims under the Plan. CCDFI asserts a claim of $3,076,217.04, as of Petition Date and $3,279,948.76, as of 21 September 2018, which BWR disputes. The claim is impaired

under the Plan. The continuing and ongoing rehabilitation, renovation and refurbishment of the Resort in place will greatly simplify and enervate the process of obtaining the requisite refinancing to pay CCDFI and other claimants in full.

Class I-C    This class consists of the secured claim of TCF presently consisting of the remaining monthly lease payments of $2,198 through to the end of the lease term, namely November 2019 at which time debtor will have the option to either purchase the golf carts at their then-appraised fair market value, renew and extend the lease, or return the golf carts. TCF contends that it is owed attorneys' fees and costs incurred in the prior debtor Imperial bankruptcy case (Imperial Bk. 1), which debtor disputes. Debtor will file an objection to TCF's claim for attorneys' fees and costs in the amount in excess of $21,000.00, which are not mentioned or addressed in the Stipulation or Order, and were allegedly incurred "by enforcing and collecting upon the original Lease Agreement" against the prior debtor Imperial Palms Resort, LLC and it now belatedly asserts.

Class II-A    This class consists of all allowed claims of the non-insider unsecured creditors in the combined amount of $96,731.00. This class will be paid in full together with interest at the rate of ten percent (10%) per annum calculated from and after the date of filing of the petition filed herein on or before twenty-four (24) months from and after the date of confirmation of the Plan described herein. This class is impaired under the Plan.

Class II-B    The sole member of this class is NAC 1, LLC, the sole equity membership stakeholder of debtor BWR and this class will receive no distribution under the Plan. This class is impaired.

**VI.    DEBTOR'S OPERATIONAL TAX CONSEQUENCES
AND THE PLAN'S TAX IMPACT UPON ITS CREDITORS**

Debtor BWR was formed on 23 May 2018. BWR is faced with a choice: it may only select to use a calendar year as its tax year, unless it elects tax treatment as a corporation, in which case it may select a fiscal year other than a calendar year that more closely matches the timing of its revenues and expenses. In light of BWR's recent retention of an accountant, this issue has not been definitively addressed at this point; however, BWR's tax planning goal will be to seek to shelter its operational cash flows to the extent permissible under applicable State and Federal law and its tax returns will be filed on a timely basis.

1  Debtor will advise the Court of its selection no later than at the time that debtor's Reply is due on 24

2  January 2019

3          As to the Plan's potential tax consequence to the debtor's respective creditors, each creditor is

4  advised to seek its own tax advice as to this issue.

5  **VII.      RISK FACTORS, <u>LIQUIDATION ANALYSIS AND FEASIBILITY</u>**

6          **A.      <u>Risk Factors Posed By The Plan</u>**          The proposed Plan has the following risks:

7          The Plan is dependent upon the continued operation and stabilization of the debtor's Hotel/Resort

8  property to a profitable and positive cash flow mode and its goal is the sale or refinancing of the Resort

9  upon reaching completion of all renovation and the stabilization on a fully operational basis by

10  September/October 2019, and full payment of one hundred percent (100%) of all creditor claims therefrom.

11  Debtor's Plan hinges on a steady and continued pattern of increasing monthly revenues generated by

12  debtor's four (4) income-generating activities, consisting of (a) the 104-room hotel  revenue and four (4)

13  apartments; (b) revenue from the 18-hole golf course, driving range and pro shop; (c) the food and

14  beverage revenue generated by the onsite restaurant and bar; and (d) special events, utilizing hotel room

15  service, the banquet, convention and conference center.

16          In the past, the Resort was able to generate $3,500,000-$4,000,000 in gross annual revenue,

17  averaging $250,000 to $300,000 of monthly – a fact that Mr. Kevin Smith and Mr. Darryl Readshaw, its

18  past owners, together with Mr. Sader, its past manager, can attest to. Debtor believes that the 24-month

19  Plan period is more than sufficient to effect increased revenue to the $4,500,000- $5,000,000 range, thereby

20  facilitating the sale or refinancing of the Property with full payment of all creditors. Debtor believes that

21  the risks hereinafter discussed are remote. However, presently unforeseen economic conditions could cause

22  Debtor to fail to meets its Plan Projections and thus prevent Debtor from finding a buyer or lender and

23  from accomplishing the sale or refinancing of the Property by February 2021. Similarly, presently

24  unforeseen events, such as acts of God, nature or man, could render the Property incapable of being

25  profitably operated as a resort hotel with convention center and banquet facilities offering golf amenities

26  and Debtor could become ultimately unable to meet its projected income rental streams or unable to

27  continue to make the adequate protection payments to secured creditor CCDFI  and lease payments to TCF

28  on a monthly basis. Such presently unforeseen circumstances, however remote, could result in the failure of

the Plan. In consequence, the failure of the Plan would result in a Chapter 7 liquidation proceeding, relief from the automatic stay being given, in all probability to the senior secured creditor CCDFI and foreclosure would follow. The security interest held by the secured creditor CCDFI, extends to virtually all of debtor's BWR's Hotel/Resort property and personal property assets, except its golf carts in which TCF has a secured interest and foreclosure would destroy any capacity for the Debtor to generate funds to pay the remainder of the creditor body unless a buyer or buyers at the foreclosure bids an amount in excess of CCDFI's then secured debt. Only in such instance would any overage proceeds, after payment of the administrative expense of the superseding Chapter 7 proceeding, be distributed pro rata among the remaining unsecured creditors of the Debtor. It is clear, however, that such an event would result in but pennies on the dollar being paid to unsecured creditors, if any thing at all.

**VIII.    Liquidation Analysis Under The Plan**

One of the Plan confirmation requirements is termed the "best interest test", which requires a liquidation analysis. Under the "best interest test", if a claimant or interest holder is in an impaired class and that claimant or interest holder does not vote to accept the Plan, then that claimant or interest holder must receive or retain under the Plan property of a value not less than the amount that such holder would receive or retain if the debtor were liquidated under Chapter 7 of the Bankruptcy Code.

In a Chapter 7 case, a debtor's  assets are usually sold by a Chapter 7 trustee. Secured creditors are paid first from the sales proceeds of properties on which the secured creditor has a lien.  Administrative claims are paid next. Next, unsecured creditors are paid from any remaining sales proceeds, according to their rights to priority.  Unsecured creditors  with the same priority share in proportion to the amount of their allowed claim in relationship to the amount of total allowed unsecured claims. Finally, interest holders receive the balance that remains after all creditors are paid, if any.

For the Court to be able to confirm this Plan, the Court must find that all creditors and interest holders who do not accept the Plan will receive at least as much under the Plan as such holders would receive under a Chapter 7 liquidation. The Plan Proponent maintains that this requirement is met here for the following reasons:

First, and foremost,  liquidation values are historically less than fair market values, or even book values for accounting purposes. Accordingly, in a forced liquidation of real property, it may be assumed to

1    be 85.0%-90.0% of fair market value, a price at which a court would order the real property sold upon a

2    judicial foreclosure, and less 7.0% attributable to costs of sale. For purposes of this liquidation analysis,

3    however, debtor BWR assumes that the best case scenario entails a fair market value of $3,500,000, less

4    7.0% cost of sale in line with CCDFI's appraisal. In  the case of receivables of questionable  collectability

5    the collection of receivables that would involve litigation, for liquidation  purposes, the face amount of the

6    claim have been discounted 100.0%, as a result of evaluating the costs entailed in collection (including

7    attorney's  fees and court costs), and thus such receivables are estimated for liquidation purposes to be

8    zero.

9        In the present case, the security interest of secured creditor CCDFI extends only to the debtor's

10    Hotel/Resort property, while secured creditor TCF Equipment Finance's security extends only to the

11    debtor's personal property, namely fifty (50) golf carts. As pointed herein, debtor BWR will file an

12    Objection to CCDFI's secured claim in regard to creditor's In a Chapter 7 liquidation, each secured

13    creditor, in order of its priority, would receive no more than the value of their respective secured interest in

14    the debtor's respective secured asset. If the value of debtor's asset is not less than the value said secured

15    creditor's claim, then to such extent, the secured creditor is unsecured. While secured creditor TCF would

16    likely receive only the then-owed amount under its Lease. Under the Plan, CCDFI will receive 100.0% of

17    the value of its secured claim, together with a monthly adequate protection payment at not less than the

18    non-default contract interest rate with full payment of the balance on or before twenty-four (24) months

19    from the Effective Date upon through the sale or refinancing of the Hotel/Resort property. Thus, CCDFI

20    will receive at least that amount or more, under the Plan it would receive in a Chapter 7 liquidation.

21    Secured creditor TCF, on the other hand, will receive its monthly lease payments at the contract rate of

22    $2,198.00 through November 2019, at which time debtor will have the option to either purchase the golf

23    carts at their then-appraised fair market value, renew and extend the lease, or return the golf carts. Thus,

24    like CCDFI, secured creditor TCF will receive at least that amount, or more, under the Plan than it would

25    receive in a Chapter 7 liquidation.

26        Similarly, the Class II-A unsecured creditor body would receive l00.0% of their  allowed claims

27    under the Plan, while Class II-B would receive nothing under the Plan. In light of the nature, extent and

28    amount of the superior secured claim of CCDFI, and the amount of administrative expense from the

superseded Chapter 11 that would become due upon conversion to a Chapter 7, the unsecured creditor body would receive nothing in a Chapter 7 liquidation. Moreover, should liquidation occur in a Chapter 7 case, a trustee is appointed and entitled to compensation from the bankruptcy estate in an amount not to exceed 25.0% of the first $5,000.00 of all moneys distributed, 10.0% of any amounts over $5,000.00, but less than $50,000, and 5.0% of any amount over $50,000.00, but not in excess of $1,000,000.00, and 3.0% of all amounts over $1,000,000.00. In this case, assuming as $3,500,000 sale price, less 7.0% costs of sale ($245,000), the trustee's compensation is estimated to be roughly equal to $120,900.00. Thus, Class II-A unsecured creditor body would receive more under the Plan than they would in a Chapter 7 liquidation.

Below is a demonstration, in balance sheet format, that all creditors and interest holders will receive at least as much under the Plan as such creditor or interest holder would receive under a Chapter 7 liquidation.

## ASSET VALUE AT LIQUIDATION VALUES

CURRENT ASSETS [13]
|  |  |  |  |
|---|---|---|---|
| (a) | Cash On Hand | $ | 10,000.00 |
| (b) | Accounts Receivable (Net Of Prepaid Rent) |  | - 0 - |
| I | Inventories |  | 10,000.00 |

TOTAL CURRENT ASSETS       $     20,000.00

FIXED ASSETS
|  |  |  |  |
|---|---|---|---|
| (a) | Office Furniture (Computers, Desks Chairs, Etc.) |  | 1,000.00 |
| (b) | Machinery & Equipment |  | 1,000.00 |

**(VIII)** ) 2050 Country Club Drive
Holtville, California
[Estimated at $3,500,000, Less 7.0% Costs of Sale]   $   3,255,000.00

TOTAL FIXED ASSETS       $     3,277,000.00

OTHER ASSETS
|  |  |  |
|---|---|---|
| (a) | Customer List | - 0 - |
| (b) | Other Intangibles | - 0 - |
| (c) | Receivables (Uncollectable) - _____ ) | - 0 - |

TOTAL OTHER ASSETS       - 0 -

**TOTAL ASSETS @ LIQUIDATION VALUE**     $     3,277,000.00

| Deleted: ¶ |
|---|
| (c)  Buildings & Land          ... [1] |

---

[13]    Revised and then-current figures will be provided prior to the hearing date.

LESS:    Secured creditor CCDFI's recovery [14]        3,279,948.76

LESS:    Chapter 7 trustee fees and expenses            120,900.00

LESS:    Chapter 11 Administrative Claims               125,000.00
         (Estimated unpaid upon conversion)

**LESS:**   Priority claims, excluding Chapter 11         - 0 -
         administrative expense claims

[1]  Total Amount of Unsecured Claims        $      96,731.00                    - 0 -

**PERCENTAGE OF THEIR CLAIMS, WHICH UNSECURED CREDITORS
WOULD RECEIVE OR RETAIN IN A CHAPTER 7:**                    **0%**

**PERCENTAGE OF THEIR CLAIMS, WHICH UNSECURED
CREDITORS WILL RECEIVE OR RETAIN UNDER THIS PLAN:**          **100.0%**

Below is a demonstration, in tabular format, that all creditors and interest holders will receive at

least as much under the Plan as such creditor or holder would receive under a Chapter 7 liquidation.

| CLASSES + CLAIMS | PAY-OUT PERCENTAGE UNDER THE PLAN | PAY-OUT PERCENTAGE CHAPTER 7 LIQUIDATION |
|---|---|---|
| Class I – Secured Claim I-A | 100.0% | 100.0% |
| Class I – Secured Claim I-B (CCDFI) | 100.0% | 100.0% |
| Class I – Secured Claim I-C (TCF Equipment Finance) | 100.0% | 0 % |
| Class II – Unsecured Claim II-A (Trade Creditors + Unpaid Employees) | 100.0% | 0 % |

---

[14]    CCDFI's secured claim, Claim No. 5-1 filed in this case is $3,076,217.04, as of Petition Date + $3,279,948.76, as of 21 September 2018, inclusive of $309,836.25 ($178,503.90 + $131,332.35) of attorneys' fees and court costs. As pointed out herein, debtor intends to file an Objection to the Claim, contesting and challenging the inclusion of $108.647.23 in "default interest" and late charges, broken down, as follows: (a) $89,871.52 in "default interest", broken down into $76,794.24 and $13,077.28 in pre-petition "default interest" for the period of "12/1/2016 to 6/19/2018" and post-petition "default interest" for the period of "6/20/2018 to 9/21/2018", while it seeks (b) $18,775.71 in late charges, broken down as $16,136.79 in pre-petition "late charges" for the period of "12/1/2016 to 6/19/2018" and $2,638.92 in post-petition "late charges" for the period of "6/20/2018 to 9/21/2018". If CCDFI is successful in overcoming BWR's Objection and the Court allows these amounts, then there would be no balance distributable to any other creditor in a liquidation.

**DEBTOR BWR. LLC'S SECOND AMENDED DISCLOSURE STATEMENT**
IN RE BWR, LLC                                        **PAGE**   26

1    Class II – Unsecured Claim II-B                - 0% -                    0%
        (Equity Security Interest)

2

3    **C.    Feasibility:  In General And Financial Projections**

4          Another requirement for confirmation involves the feasibility of the Plan, which means that

5    confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial

6    reorganization, of the Debtor or any successor to the Debtor under the Plan, unless such liquidation or

7    reorganization is proposed in the Plan.

8          There are at least two ( 2 ) important aspects of a feasibility analysis. The <u>first aspect</u>

9    considers whether the debtor will have enough cash on hand on the Effective Date of the Plan to pay all

10   the claims and expenses, which are entitled to be paid on such date. The Plan Proponent maintains that

11   this aspect of feasibility will be satisfied and the accurate figures will be provided prior to the hearing

12   date. The sources of the cash debtor BWR will have on hand by the Effective Date is estimated at

13   $250,000.00 will be satisfied and the accurate figures will be provided prior to the hearing date.

14         The <u>second aspect</u> considers whether the Plan Proponent will have enough cash over the life of

15   the Plan to make the required Plan payments. Prior to the hearing date, the Plan Proponent will provide

16   financial statements, which include projected financial information from Effective Date of Plan through the

17   twenty-four (24) months outlined in the Plan, based upon post-petition historical operating figures deemed

18   reliable by debtor.

19         In a meeting with Mr. Sader on last Friday, 8 February 2018, he provided a Consolidated Budget

20   Worksheet Summary for 2016 to the debtor's executives that he had prepared under Mr. Sader's direction

21   while he was managing the Resort. Subsequently, BWR's accountant and bookkeeper Ms. Zamora

22   prepared a Consolidated Budget Worksheet Summary for 2019 with the assistance of the Resort's onsite

23   chief operating officer Sandra Mejorado and Mr. Sader's projections. [15, 16]

24   _____

[15]       True and correct copies of a Consolidated Budget Worksheet Summary for 2016 prepared by  and
25   provided to debtor by Mr. Sader and the Consolidated Budget Worksheet Summary for 2019 prepared by
     BWR's accountant and bookkeeper Ms. Zamora with the assistance of the Resort's onsite chief operating
26   officer Sandra Mejorado are marked as Exhibits C and D, respectively and are attached to the Declaration of
     Eddie Mejorado filed concurrently herewith
27       [16]       At last Friday's meeting, Mr. Sader was reluctant to provide any further information until his
     employment had been approved by the Court. If approved by the Court, Mr. Sader intends to return to the Resort this
28   Thursday or Friday, when he will again meet with all parties at the Resort. Debtor understands full well that the
     financial projections required must cover the twenty-four (24) proposed Plan period and when they re-meet this
                      **DEBTOR BWR. LLC'S SECOND AMENDED DISCLOSURE STATEMENT**
     **IN RE BWR, LLC**                                                    **PAGE**    27

**Debtor's Efforts At Refinancing Barbara Worth Resort Property**

The commercial real estate sector has shown marked signs of life across the nation. Recent reports reveal that commercial real estate lending is experiencing gradual gains, with expectations leaning toward continued but slow growth in the coming year.

Debtor's President and CEO, Mr. Mejorado has been involved in the lending business for over twenty (20) years and has developed relationships with multiple lending sources and is actively pursuing refinancing the debtor's Resort. To date, while the debtor has obtained several Letters of Intent from various lending sources ,debtor continues to shop for more favorable terms. To the degree the gross loan amount is reduced from an optimum $3,500,000.00 level, the reduction will necessitate a larger equity contribution by either the debtor's principal or an unrelated third party to gap the difference.

It is anticipated as debtor's Resort's income stream from its revenue producing operations gradually increases, additional lending sources will express interest in assisting debtor in refinancing the building. Additionally, Debtor's President and CEO, Mr. Mejorado is also in discussions with various parties that have expressed an interest in participating on an equity basis with the debtor.

**YOU ARE ADVISED TO CONSULT WITH YOUR ACCOUNTANT OR FINANCIAL ADVISOR, IF YOU HAVE ANY QUESTIONS PERTAINING TO THESE FINANCIAL STATEMENTS.**

In summary, the Plan proposes to pay the secured creditor CCDFI, an adequate protection of $17,592.88 each month, or interest only payments, whichever is greater and after payment of administrative expenses, if any, the balance after payment of budgeted monthly operating expenses and budget reserve. Within ten (10) days of confirmation, debtor will deposit approximately $250,000.00 into an account from which both the debtor's seasonal operational shortfall and the CCDFI monthly payments can be automatically withdrawn and forwarded to CCDFI on a monthly basis. As Debtor's financial projections will demonstrate, upon stabilization, Debtor will have an average cash flow, after paying operating expenses and post-confirmation taxes and debt service of approximately $_____ to $_____

_____

week, with Mr. Sader's input and assistance, a 24-month cash flow projection covering the Plan period in conjunction with the debtor's books and records will be hammered out.

IN RE BWR, LLC

**DEBTOR BWR. LLC'S SECOND AMENDED DISCLOSURE STATEMENT**

PAGE  28

for the seasonal months (October through May) and break-even or small negative cash flow of

approximately $3,000 to $5,000.00 for the non-seasonal months (June through September) each  month for

the life of the Plan. The final Plan payment is expected to be paid on the date twenty-four (24)  months

from the Effective Date. At such time, the final  payment of the unpaid  principal balance of the secured

claim and the balance then due to unsecured creditors in Classes II-A and II-B will also be paid from either

the refinancing of the Resort or its sale, or a combination of refinance funds and equity contributions from

either the debtor's principal or an unrelated third party. The Plan Proponent contends that Debtor's

financial projections that will be provided prior to the hearing date are feasible. Debtor's projections show

that at during the life of the Plan period, on an annualized basis, Debtor's monthly net operating income is

projected to be approximately $_____ to $_____ for the seasonal months (October through

May) and break-even or small negative cash flow of approximately $_____ to $_____[17] between for

the non-seasonal months for the life of the Plan after paying operating expenses and  post-confirmation

taxes and after payment of $17,592.88 to secured creditor CCDFI. Furthermore, as discussed earlier in the

Disclosure Statement, Debtor has implemented procedures and is currently actively engaged in efforts to

refinance and/or sell the Property.

**VIII.   CLAIMS ANALYSIS, OBJECTIONS TO CLAIMS,**
**FRAUDULENT CONVEYANCES AND PREFERENCES**

    **A.   Revestment And Deadline For Debtor's Objections**   The revested Debtor must, if at all,

object to any claim within sixty (60) days of the Effective Date of the Plan. The Debtor has reviewed pre-

petition financial events with a view toward discovering any fraudulent transfers or preferential

transactions. Having done so, none of consequence has been discovered.

    **B.   Claims Analysis**

       1.   Franchise Tax Board [Claim No. 1-1/Amount: $800.00]     This claim has been paid

in full.

       2.   TCF Equipment Finance Claim [Claim No. 2-1/Amt. $28,954.00; Status: Disputed]   The

Debtor will pay the approved claim of secured creditor TCF Equipment Finance as agreed between the

---
[17]     See, fn. 5 above.

**DEBTOR BWR. LLC'S SECOND AMENDED DISCLOSURE STATEMENT**

IN RE BWR, LLC                                                        **PAGE**    29

parties and approved by the Court in the Stipulation and Order dated 7 August 2018 ("Stipulation/Order"). [Doc. Nos. 54, 84] In light of debtor's monthly payments of $5,198.00 commencing in September 2018 and continuing through January 2019 and its February 2019 payment of $2,584.00 satisfied the "outstanding delinquent amount" of $15,386.00 incurred by the prior debtor Imperial, which debtor agreed to assume under the terms of the Stipulation/Order. Debtor will continue to make the regular monthly lease payments at the contract rate of $2,198.00 through the term of the lease, namely November 2019, at which time debtor will have the option to either purchase the golf carts at their then-appraised fair market value, renew and extend the lease, or return the golf carts. TCF contends that it is owed attorneys' fees and costs incurred in the prior debtor Imperial bankruptcy case (Imperial Bk. 1), which debtor disputes. Debtor will file an objection to TCF's claim for attorneys' fees and costs in the amount in excess of $21,000.00, which are not mentioned or addressed in the Stipulation or Order, and were allegedly incurred "by enforcing and collecting upon the original Lease Agreement" against the prior debtor Imperial Palms Resort, LLC and it now belatedly asserts *[p. 2, ll. 14-16, Doc. No. 99].*

    3.    <u>Daniel Chiu Claim [Claim No. 3-1/Amt. $2,000,000.00; Status: Disputed]</u>    Although the Proof of Claim identifies Daniel Chiu, erstwhile Chapter 11 debtor Imperial Palm Resort's ("Imperial") manager, as the claimant, in support of his claim, Mr. Chiu and his counsel attach a Imperial County Superior Court Complaint that was filed by plaintiff Oasis Growth Partners, LLC ("OASIS") <u>and names Mr. Eddie Mejorado, individually, as the sole defendant. Debtor BWR is not named as a defendant nor its the debtor mentioned in the body of the Complaint.</u> At present, through separate representation, on 30 October 2018, counsel has sent "meet and confer" correspondence under Sections 435.5 and 430.41, Code, Civil Procedure, questioning the legal basis for plaintiff's causes of action. In response, on 13 December 2018, OASIS filed an First Amended Complaint in the state court matter. Mr. Mejorado has filed an Answer to the OASIS Complaint and asserted multiple affirmative defenses. Debtor BWR will file an objection to OASIS/Daniel Chiu's claim and expects to be successful in  its objection to this "bogus" claim.

    4.    <u>Imperial County Treasurer-Tax Collector [Claim No. 4-1/Amt. $99,0291.47]</u>    Debtor will pay the approved amount of the claim in full, including any and all accrued interest and penalties pursuant to the Plan.

5.    <u>CCDFI Claim [Claim No. 5-1/Amt. $3,076,217.04, as of Petition Date + $3,279,948.76, as of 21 September 2018; Status: Disputed]</u>  The Debtor will pay the court-approved claim of secured creditor CCDFI in full, subject to CCDFI's submission of its supportive ledgers and calculations relative to the amount it alleges is owed by the debtor pursuant to the Business Loan Agreement, Promissory Note, Deed of Trust and Assignment of Rents, Commercial Security Agreement and UCC-1 Financing Statement dated 1 August 2012. First of all, CCDFI's Itemized Statement of Indebtedness and CCDFI's analysis is devoid of any "back-up" in support of the figures presented, is somewhat internally contradictory and reflects none of the debtor's four (4) "adequate protection" payments, totaling $70,371.52 ($17,592.88 x 4 for October-December 2018 + January 2019). Critically, CCDFI's analysis suffers from a fundamental flaw, interestingly, one previously pointed out by CCDFI's counsel: debtor BWR and CCDFI are <u>not</u> in contractual privity,[18] yet CCDFI's claim includes $108.647.23 in "default interest" and late charges, broken down, as follows: (a) $89,871.52 in "default interest", broken down into $76,794.24 and $13,077.28 in pre-petition "default interest" for the period of "12/1/2016 to 6/19/2018" and post-petition "default interest" for the period of "6/20/2018 to 9/21/2018", while it seeks (b) $18,775.71 in late charges, broken down as $16,136.79 in pre-petition "late charges" for the period of "12/1/2016 to 6/19/2018" and $2,638.92 in post-petition "late charges" for the period of "6/20/2018 to 9/21/2018".

It is anticipated that CCDFI will assert *Pacifica L 51 LLC v. New Investments, Inc.* (*In re New Investments, Inc.)(9th Cir. 2016) 840 F.3d 1137,* in which the Ninth Circuit Court of Appeals, adopting the majority rule, held that due to the revised language of Section 1123(d) of the Bankruptcy Code, the cure amount may include a post-default rate of interest if the underlying loan documents and applicable non-bankruptcy law provide for the payment of post-default rate interest upon a default, thereby effectively overruling the Ninth Circuit's decision on the issue taken in *In re Entz-White Lumber & Supply, Inc. (9th Cir. 1988) 850 F.2d 1338* The decision in the *New Investments* case and its progeny, however, are based solely on the Court's interpretation of Section 1123(d) as instructive, requiring such a result, although the no such support is voiced in the statute's legislative history.[19] One justice vigorously  dissented, noting in

---

[18]    pp. 11-12, CCDFI Surreply dat. 10 Dec. 2018 [Doc. No. 115]
[19]    In point of fact, the statute's legislative history reveals that it was Congress' intent to limit the secured creditor's recovery to the benefit of the original bargain and prevent a court contrived windfall on the creditor's behalf.

part that the Bankruptcy Code still provides no clear definition of "cure," leaving the matter open to debate. The New Investments decision is limited to the Court's interpretation of the bankruptcy law and does not address whether or not default interest and/or late charges constitute a penalty under applicable State law.

Accordingly, debtor BWR, on the various grounds referenced above will file an objection to CCDFI's claim.

**IX.     OPERATIVE PROVISIONS**

**A.     Retention of Assets.**     On the date of Confirmation, the Debtor shall be fully restored and revested to the assets of the estate subject to the terms and conditions of this Plan pursuant to Section 1141(b) of the Bankruptcy Code.

**B.     Post-Confirmation Compliance.**     During the period of Plan performance, the Debtor shall pay all quarterly fees due the United States Trustee pursuant to 28 U.S.C. § 1930, et seq. and shall prepare and file the requisite quarterly reports. Failure to pay fees or file reports timely shall constitute Default under the Plan.

**C.     Post-Confirmation Management.**

Except for a brief period of 23 May 2018 through 10 July 2018, the business of the debtor has been operated prior to and since initiation of this proceeding by the debtor-in possession's Chief Executive Officer Eddie Mejorado. Debtor BWR contemplates that management of the debtor's business will remain unchanged debtor-in possession's Chief Executive Officer Eddie Mejorado shall continue to be responsible for the operations of the Debtor throughout the life of the Plan.

On behalf of the debtor, Mr. Mejorado is actively seeking to hire professional manager or management company to assist him in the relaunching of the Resort. Upon selection, debtor will file a motion to employ such individual or management company entity.

**D.     Retention of Automatic Stay.**     So long as the Debtor is in compliance with the terms of the Plan, the automatic stay imposed by Section 362 of the Bankruptcy Code shall remain in effect for a period of twenty-four (24) months from and after the date of confirmation of the Plan.

**E.     Acceleration of the Plan.**     To the extent that the Debtor finds it desirable to accelerate performance of the Plan, the Debtor may do so without further approval of the Court. The Debtor may prepay in whole or in part the claims in any class as long as such prepayment does not violate the terms of

the Plan; however, acceleration of the Plan will not increase any dividend to any class of creditors.  Except as otherwise provided in the Plan, any such partial payment shall be made pro rata among the claims of such class; provided, however, that nothing in the Plan shall prevent or impede the right of the Debtor, without court order, to prepay in whole or in part, any administrative expense.  To the extent the Debtor finds it desirable or necessary to accelerate performance of the Plan, the Debtor may seek a modification of the Plan; possibly including further financial reorganization.

**F.    Retention of Jurisdiction.**         Pursuant to 28 U.S.C. § 1471(b), and as agreed between the Debtor and its creditors, the jurisdiction of the Court shall continue after the Effective Date of the Plan until the Plan is fully performed with respect to any matter arising or related to the case herein.  So long as no material default has been determined by the Court to exist under this Plan, no act shall be taken nor shall any action or proceeding estate to enforce or collect, directly or indirectly, any claim covered by the Plan.

**G.    Post-Confirmation Default.**         In the event of an alleged default or breach in the terms of the Plan or in the proposed treatment of any claim, such alleging creditor shall be required to file a motion or commence other proceedings with the bankruptcy court seeking such relief such party deems appropriate. The debtor or any other party in interest shall be entitled to object to such requested relief. Should the debtor default in connection with its Plan obligations, then the debtor would have but two (2) choices:

(a)  Make application and to seek approval of the Court and the creditors to modify the Plan; or

(b)  Move to convert the proceeding to a Chapter 7 liquidation proceeding. Should conversion occur, no Plan would be presented, modified or otherwise. Any creditor may, upon Plan default, move the court for modification of the Plan or conversion of the proceeding to a Chapter 7 liquidation proceeding. Upon any debtor default, the U.S. Trustee or any creditor shall have the option to file any formal proceeding that he/she/it deems appropriate, including the opportunity to move for dismissal or conversion of the case. In such event, the debtor, the U. S. Trustee's Office, or any party in interest (not just creditors), shall be entitled to object to any such requested post-default relief requested by the Debtor.

**H.    Definitions.**

DEBTOR BWR. LLC'S SECOND AMENDED DISCLOSURE STATEMENT

IN RE BWR, LLC                                                                    PAGE  33

The following are the definitions applicable to the Plan and shall have the meanings specified

below:

1.1     "Administrative Expense":  Those expenses allowed within the definition of Section 503 of the Code.[20]

1.2     "Allowed Claim" means (a) any claim in respect of which a proof of claim has been filed with the Court on or before the applicable bar date and in accordance with Code Section §501 and Bankruptcy Rule §§ 3003(c), 3004, or 3005; or (b) any claim listed in the schedule of liabilities prepared by the Debtor and filed with the Court pursuant to Code Section § 501 and not listed as disputed, contingent or unliquidated as to amount, and in either case to which no objection to the allowance thereof has been interposed within any applicable period of limitation or order of this Court, or as to which any objection has been determined by an order or judgment which is no longer subject to appeal or certiorari proceedings is pending.  An allowed claim may be secured or unsecured as the case may be.

1.3     "Ballot" means the written form labeled as such and mailed by the Debtor to the Creditors and by which a creditor votes to accept or reject the Plan.

1.4     "Bar Date", or "Claims Bar Date" means 13 December 2018,  the last date set by the Court for filing proofs of claim.

1.5     "Case" means this proceeding for the reorganization of the Debtor under Chapter 11 of the Code now pending in the Court and having Case No. 18-03650-MM 11.

1.6     "Claim" means any right to payment or right to an equitable remedy for breach of performance if such breach gives rise to a right of payment, against the Debtor, in existence on or as of 20 June 2018, whether or not such right is liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable secured, unsecured, known or unknown.

1.7     "Class" means any class into which allowed claims are classified pursuant to Article II of the Plan.

1.8     "Code" means Title 11, United States Code, Section §101, et seq., commonly referred to as the Bankruptcy Code.

---

[20]     11 U.S.C. § 501. Unless otherwise specifically set forth, all reference to and all citations in this Plan to "Section '__' " is to the indicated section of the Bankruptcy Code, 11 U.S.C.

1.9    "Confirmation Date" means the date on which the order of confirmation is entered by the Court.

1.10    "Court" means the United States Bankruptcy Court for the Southern District of California, together with any other court granted jurisdiction by 23 U.S.C. Section §1471, and any successor court as may be granted jurisdiction herein by Congress.

1.11    "Debtor" means BWR, LLC, debtor-in-possession in the above-captioned case.

1.12    "Default" means the failure of the debtor to make payment or to perform any other act required herein on or before the date of payment or performance.

1.13    "Effective Date of the Plan" means a date thirty (30) days after the date on which the order of confirmation becomes final and binding.

1.14    "Barbara Worth Hotel and Resort", or "Resort", means debtor's real property located at 2050 Country Club Drive, Holtville, California 92250, sitting on roughly 99 acres and consisting of seven (7) buildings with a 104-room hotel with four (4) apartment-type units, a conference and convention center, ballroom, restaurant/bar and an 18-hole golf course.

1.15    "Impaired by the Plan" refers to the concept of impairment as set forth in Code Section §§1124.

1.16    "Insider":  means any person who would be an "insider", as defined in Section § 101(28) of the Code.

1.17    "Order of Confirmation" means the order entered by the Court confirming the Plan in accordance with Chapter 11 of the Code.

1.18    "Plan" means the Plan of Reorganization, as amended.

1.19    "Priority Claim" means a claim entitled to priority under Code Section § 507(a).

1.20    "Proof of Claim" means the written statement prescribed by Code Section §501 and Bankruptcy Rule 3001 setting forth a creditor's claim.

1.21    "Reorganized Debtor" means the Post-Confirmation Debtor.

1.22    "Secured Claim" means any claim secured by a lien on property in which the Debtor has an interest and any claim as defined in Section § 506 of the Code.

1.23    "Secured Creditor", or "CCDFI", as to the debtor's Resort property means Clearinghouse

Community Development Financial Institution, as lender pursuant to the CCDFI Loan Documents, including its First Deed of Trust encumbering debtor's Resort property.

     1.24    "Time" means the time within which or the date upon which any payment or other act required of the Debtor under the Plan shall be calculated and determined in the manner prescribed by the Bankruptcy Rule § 9006(a).

     1.25    "Unsecured Claim" means any claim against the Debtor which is not a secured claim or a priority claim, including deficiency claims of any undersecured secured claim holder.

     1.26    "Other Definitions":  whenever any word, word or phrase which is defined by any provision of the Code is used, then, unless this Plan or the context specifically establishes a different meaning, such word, word or phrase shell, for the purposes of this Plan, shall have the same meaning as that established by the Code.

     **THE FOREGOING IS A BRIEF SUMMARY OF THE PLAN AND SHOULD NOT BE RELIED UPON FOR VOTING PURPOSES. CREDITORS ARE URGED TO READ THE PLAN IN FULL.  CREDITORS ARE FURTHER URGED TO CONSULT WITH COUNCIL, OR WITH EACH OTHER, IN ORDER TO FULLY UNDERSTAND THE PLAN. THE PLAN IS COMPLEX AND AN INTELLIGENT JUDGMENT CONCERNING SUCH PLAN CANNOT BE MADE WITHOUT UNDERSTANDING IT.**

                            WOLFGANG F. HAHN + ASSOCIATES

Dated:  13 February 2019         By:   /s/  Wolfgang F. Hahn        
                                    Wolfgang F. Hahn
                                    Attorney for Debtor
                                    BWR, LLC

BWR, LLC
By:  Resort Mgmt., LLC
    Its Manager

By:   /s/  Eddie Mejorado        
            Chief Executive Officer of
            Resort Mgmt. LLC

**Page 25: [1] Deleted**        **Microsoft Office User**        **2/13/19 1:57:00 PM**